## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VIRENTEM VENTURES, LLC, D/B/A ENOUNCE,<br><br>    Plaintiff,<br><br>    v.<br><br>YOUTUBE, LLC; GOOGLE, LLC.<br><br>    Defendants. | C.A. No. 18-917-MN<br><br>JURY TRIAL DEMANDED |

**COMBINED JOINT LETTER REGARDING PROTECTIVE ORDER DISPUTES**

Plaintiff Virentem Ventures, LLC ("Plaintiff") and Defendants YouTube, LLC and Google LLC ("Defendants") submit this joint letter pursuant to the Court's April 3, 2019 order (D.I. 72) and Section 8(g)(iii) of the Court's scheduling order in this case (D.I. 69) to set forth the issues in dispute regarding the Protective Order. There are, broadly, four categories of dispute:

1. Definition of "experts" and "professional vendors" (§§ 2.7, 2.15);

2. Acquisition Bar (§ 8(c));

3. Source Code Access (§§ 9(i), 9(l)); and

4. Export Control Provisions (§ 14).

The parties continue to meet and confer regarding these disputes based on the issues articulated in these position statements, and will notify the Court promptly if any additional disputes are resolved prior to the hearing.

| | |
|---|---|
| ASHBY & GEDDES | RICHARDS, LAYTON & FINGER, P.A. |
| */s/ Andrew C. Mayo* | /s/ *Sara M. Metzler* |
| John G. Day (#2403)<br>Andrew C. Mayo (#5207)<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899<br>(302) 654-1888<br>jday@ashbygeddes.com<br>amayo@ashbygeddes.com | Frederick L. Cottrell, III (#2555)<br>Kelly E. Farnan (# 4395)<br>Sara M. Metzler (#6509)<br>One Rodney Square<br>920 N. King Street<br>Wilmington, DE 19801<br>(302) 651-7700<br>cottrell@rlf.com<br>farnan@rlf.com<br>metzler@rlf.com |
| *Attorneys for Plaintiff* | *Attorneys for Defendants YouTube, LLC and Google LLC* |

Dated: May 3, 2019

I. **Definition of "experts" and "professional vendors" (§§ 2.7, 2.15)**

**Defendants' Position:** As Defendants propose, past or current Party employees, or current employees of a Party's competitor should not be permitted to be experts or vendors who can view confidential material under the Protective Order. This is a commonplace, and common sense, requirement. *OpenPrint LLC v. Brother Int'l Corp.*, C.A. 18-649-MN, D.I. 25 at § I(E)(7)(b) (D. Del. Feb. 21, 2019); *TrueMail Techs., LLC v. iContact, LLC*, C.A. 18-713-MN, D.I. 27 at ¶ 7 (D. Del. Jan. 22, 2019); *Photonic Imaging Solutions, Inc. v. Lorex Tech. Inc.*, C.A. 18-487-MN, D.I. 30 at § 7(b)(iv)(b) (D. Del. Jan. 18, 2019); see also *Gillette Co. v. Dollar Shave Club, Inc.*, 2018 WL 3528720, *2 (D. Del. July 23, 2018) (barring disclosure to expert who "was until recently an employee of one of Plaintiff's competitors"); *Corley v. Google, Inc.*, 2016 WL 3421402, *2 (N.D. Cal. June 22, 2016) (ruling that "it is usually improper to hire an opponent's former employee as an expert" and "it would create an unnecessary risk of competitive harm if the court permitted Plaintiffs to hire the former employees of Google's competitors as experts"). That these cases may not have used the "exact definitions" Defendants' propose does not make them inapplicable as Plaintiff contends. Defendants should not have to share confidential, proprietary and business-sensitive information with their competitors, much less Plaintiff's employees. Indeed, that would defeat the whole point of a protective order.

During the parties' negotiations, Plaintiff argued its proposal was justified because Defendants have many competitors. But that cannot justify the risk from disclosure of Defendants' confidential and proprietary materials to competitors and to Plaintiff itself. For example, Plaintiff's first proposed expert highlights the clear and certain prejudice from Plaintiff's proposal. He is the co-founder and principal of a "stealth mode start up[] aiming at developing and protecting technology in … smarthome friendly appliances," who is currently prosecuting at least three patent applications facially related to the asserted and accused technologies (including accused Nest devices). Notably, while Plaintiff complains of Defendants objections to Plaintiff's proposed experts to date, Plaintiff does not identify anything specific in Defendants' objections that are actually unfounded. Plaintiff also does not and cannot show the pool of qualified experts is so small that Defendants should be subject to the certain prejudice from exposure of its confidential information to competitors and Plaintiff.

And while Plaintiff asserts that Defendants have not shown "an actual risk of disclosure or harm," the reason Plaintiff opposes this provision is so they can disclose these materials to Defendant's competitors and Plaintiff's employees, which is precisely the harm Defendants seek to avoid. Further, contrary to Plaintiff's suggestion, Defendants' proposal does not seek to preclude a mere "potential competitor" as Plaintiff misleadingly quotes, but rather reasonably precludes someone whom, at the time of retention, is "anticipated to become an employee of a Party or of a Party's competitor."

**Plaintiff's Position:** Defendants' proposal is overly broad and unjustified in that it seeks a blanket exclusion of any of the parties' past employees, or any current or *anticipated* employee of any "competitor" from being an expert or professional vendor, regardless of whether such individual's prior or anticipated role presents an actual risk of disclosure or harm. This is unnecessary because Defendants already have the ability to object to any identified individual if they can articulate the basis of the risk of disclosure, and Defendants should not be allowed to use the mere fact that an individual is associated with a "competitor" or "potential competitor" to reject a given expert or professional vendor outright.

Defendants claim their definitions are "commonplace, and common sense, requirement[s]," citing five cases. Three involve agreed Protective Orders, none of which

contain the exact definitions Defendants propose: none prohibit former employees and the *TrueMail Techs., LLC* definition does not address competitors. *Corley v. Google, Inc.* is a Northern District of California case in which the Court opted for the ND Cal model definition (which did not address "anticipated" employees) because the plaintiff failed to "show 'specific harm or prejudice' [would] result if the court denie[d its requested deviation]." 2016 WL 3421402, *2 (N.D. Cal. June 22, 2016); *see MasterObjects Inc. v. Google, Inc.*, Case No. 11-cv-01054-LB, 2012 WL 2958227, at *2-3 (N.D. Cal. Jul. 19, 2012)). The *Gillette Co. v. Dollar Shave Club, Inc.*, 2018 WL 3528720, *2 (D. Del. July 23, 2018) case stands for the unremarkable proposition that procedures for objecting to experts, like the one the parties have already agreed to, are sufficient to prevent disclosure to experts about whom an objecting party can articulate a specific risk of inadvertent disclosure.

Moreover, there is no dispute that current employees cannot access the other party's protected material. Permitting past employees of a party, or current and potential employees of a competitor to be Experts or Professional Vendors will not require Defendants "to share their [proprietary] information with their competitors." Indeed, experts still require Defendants' approval under section 7.5(a). If Defendants identify a particular risk for a proposed expert, they may object. If they do so, they "bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert." Defendants' proposal seeks to sidestep this burden and instead impose a preemptive restriction on who Plaintiff can use as an expert or vendor. Defendants' requested definition is thus contrary to the law regarding when a protective order may be imposed and who bears the burden to demonstrate good cause for its entry.

## II.    Acquisition Bar (§ 8(c))

**Defendants' Position:** As with the prosecution bar, a bar on acquiring related patents is narrowly tailored to lessen the risk of use, even if inadvertent, of Defendants' fulsome production and disclosure of their confidential information in this case. While there is some authority in this District suggesting that acquisition bars are disfavored, courts have also found that acquisition bars are appropriate. *Inventor Holdings, LLC v. Google, Inc.*, 2014 WL 4369504, *1 (D. Del. Aug. 27, 2014) (imposing acquisition bar because "it is difficult to envision circumstances in which the *inadvertent* disclosure of highly confidential information would not be a risk"), *cf. In re Deutsche Bank Tr. Co. of Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) (recognizing the difficulty of "compartmentaliz[ing] and selectively suppress[ing] information once learned, no matter how well-intentioned the effort").

The risk is more than theoretical here. Virentem's predecessor-in-interest, EPL Holdings, Inc. disclosed IP Navigation Group, LLC, a known patent-aggregation company, as an "advisor to Plaintiff" in a prior lawsuit. *EPL Holdings, LLC v. Apple, Inc.*, N.D. Cal. Case No. 3:12-cv-04306 (Dkt. 29). Don Hejna, the named inventor on 7 of the 11 patents-in-suit and CEO and Managing Member of Plaintiff, was also the named inventor on another patent which was asserted against over 250 defendants by eDekka LLC, an affiliate of monetization firm IP Edge LLC.[1] Moreover, the first technical expert that Plaintiff proposed to disclose Google and YouTube's highly confidential information listed as his "IP Experience" "Patent mining and mapping of old patents to newer domains," and "Finding of good patents belonging to small

---

1

http://www.mondaq.com/unitedstates/x/714742/Patent/Former+Enounce+Video+Playback+Patent+Portfolio+at+Issue+in+New+Suit+Against+Alphabet

entities." The second technical expert plaintiff disclosed is a currently-practicing attorney who was previously counsel of record for an entity named Blue Spike, which "filed approximately 100 patent infringement lawsuits, including 57 within the Eastern District of Texas between August and October 2012." *Blue Spike, LLC v. Adobe Sys., Inc.*, No. 14-CV-01647-YGR, 2015 WL 5542995, at *1 (N.D. Cal. Sept. 18, 2015). Plaintiff notes that Defendants have withdrawn their preliminary objections to this second expert, however Defendants did so after Plaintiff represented that he would sign onto the operative Protective Order, which should include the protections of an Acquisition Bar as Defendants propose.

Although not raised during the parties' negotiations on the protective order, during which Plaintiff instead simply objected to having an acquisition bar at all, Plaintiff now complains that the "breadth" and nature of "restrictions" in the bar are problematic. Defendants remain willing to meet and confer with Plaintiff as to these newly raised concerns. But they should not be basis to reject an acquisition bar altogether.

**Plaintiff's Position:** There is no justification for including an acquisition bar, and the one Defendants propose is overly broad. Defendants must show good cause for including a bar and also "must show that the information designated to trigger the bar, the scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." *In re Deutsche Bank* at 1381. Defendants cannot do either. Neither the breadth of the information that subjects an individual to Defendants' proposed bar (all non-public information produced) nor the restrictions on activities (advising regarding acquisition of patents that deal with any technology analogous to functionality found in Defendants' Highly Confidential information – which is likely to be nearly all of the documents produced here) nor the duration (3 years post litigation) are tailored to any potential risk Defendants may identify.

Acquisition bars are disfavored in this district.[2] *See e.g., Data Engine Tech. LLC v. Google Inc.*, C.A. No. 14-1115-LPS, D.I. No. 33, (D. Del. April 8, 2015); *PLL Tech. Inc. v. Altera Corp.*, C.A. No. 14-942, D.I. No. 36 (D. Del. April 8, 2015); *TQ Beta, LLC v. DISH Network Corp. et al.*, C.A. No. 14-848, D.I. No. 32 (D. Del. April 1, 2015). Indeed, Defendants have previously attempted – and failed – to obtain an acquisition bar in this Court that was far narrower than what they propose here, which is not a "narrowly tailored" bar on acquiring related patents as Defendants claim. *Data Engine*, D.I. No. 31, Ex. 1 at 10.[3] In *Data Engine*, Defendants asked this Court to impose a bar against involvement in acquiring patents relating to the technology at issue in the case *for assertion against the other party*, citing the plaintiff's and plaintiff's counsel's extensive representation of non-practicing entities. *Id*. at D.I. No. 31, p. 2. Even with the limited nature of that proposed acquisition bar, this Court rejected it because the Court "was not persuaded that the risks identified by Defendant from the absence of such a bar outweigh the undue prejudice to Plaintiff and Plaintiff's counsel that would result from adoption of such a bar." *Id*. at D.I. No. 33.

Defendants have made no showing that the absence of the acquisition bar would result in "a clearly defined and serious injury to" Defendants, let alone done so "with specificity." *Lesher*, 2010 WL 11672187 at *1. As to Plaintiff's prior litigation, Plaintiff asserted patents it

---

[2] Defendants' only cite relating to an acquisition bar is to a special master recommendation. *Inventor Holdings, LLC v. Google, Inc.*, 2014 WL 4369504, *1 (D. Del. Aug. 27, 2014).
[3] In *Data Engine*, defendants cited – and the Court rejected – *Investor Holdings*.

had always owned – none were acquired. Plaintiff was precluded from sharing confidential information with the alleged patent-aggregation company, IP Navigation Group, in that litigation, and has no current relationship with that entity. Regarding eDekka, Mr. Hejna sold a patent to eDekka. Mr. Hejna was not involved in the assertion, but even if he was, the proposed bar does not preclude selling patents in any event.

As to Google's comments about Virentem's "second technical expert [Mr. Anderson]," they are moot. Defendants have withdrawn any objection to Mr. Anderson provided he agrees to the protective order ultimately ordered by this Court – regardless of whether it has an acquisition bar or not. As to Plaintiff's "first technical expert," Defendants have maintained their objections for a variety of reasons, and hence there is no risk of disclosure. Indeed, as with the definition of expert discussed above, if Defendants have any significant concern of risk they can object to an expert, and that objection will be resolved with withdrawal of the expert or a determination by this Court. There is simply no showing here that would justify imposition of an acquisition bar.

Further, Defendants proposed bar is not "narrowly tailored." Defendants' proposal extends to all "activity related to" acquiring patents or advising or counseling clients regarding such acquisitions, and that broad set of activities is prohibited regardless of whether the intention was to assert such acquired patents against Defendants. The proposed bar is not even limited to "related patents," but instead extends to "any technology analogous to functionality found in the Google or YouTube technical information … reviewed or learned by [the person subject to the bar]." The acquisition bar should be rejected in its entirety.

### III. Source Code Access (§§ 9(i), 9(l)) Plaintiff's Position:

**Plaintiff's Position:** Plaintiff requests that authorized persons be permitted to use end-to-end encrypted live video chat services to view and discuss printed source code. Two Bunsow De Mory attorneys working on infringement in this matter work remotely and have infants and multiple children under five at home. It would be very burdensome for them to travel to Redwood City every time they need to view source code. End-to-end encryption of live video chat services is sufficient protection against potential interception of the video chat. Plaintiff has offered revised language explicitly limiting its end-to-end encrypted live video chat proposal to printed source code, mooting most of Defendants' concerns. Defendants' complaints regarding lack of "ability to monitor" the chats are meritless – they cannot monitor conditions while authorized persons view printouts in authorized locations anyway. The encrypted chat proposal is no different.

Plaintiff also seeks to have the source code computer available in Defendants' counsel's office, where it is currently securely located, for select depositions to avoid having only portions of files available for questioning. Making the code available for deposition where it currently resides will eliminate unnecessary roadblocks in discovery without risk or burden to Defendants. There are more than 23,000 files currently available for inspection on the Computer and the number of pages that can be printed is limited to 500. Even if a reasonable number of additional pages is allowed, there will undoubtedly be situations in which a deponent or questioning attorney need to reference lines of code other than those printed through the request procedures.

**Defendants' Position:** The availability of the source code in counsel's offices belies any need to stream that code to outside participants by video chat as Plaintiff proposes (§ 9(i)). Source code is among the most important and confidential information that Defendants possess. *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1300 n.13 (Fed. Cir. 2016) ("[I]t is well recognized

among lower courts that source code requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property."). If Defendants' source code were to be exposed, even inadvertently, Defendants would face potentially devastating competitive harm. *Id.* (advising caution regarding the "significant consequences that might result from unauthorized or inadvertent disclosure" of source code). Plaintiff's unorthodox suggested methodology offers no discernable safeguards or ability to monitor who is on the other side of the video chat or what they are doing with any streamed images, including copying or recording them through screen captures. Indeed, this proposal runs directly counter to the parties' agreement that the Source Code Computer shall not have Internet or network access and shall not create transfers to any outside media, and to their agreement not to use or possess, *inter alia*, any camera-enabled device while accessing the Source Code Computer. § 9(c).

Further, during the negotiation process, Defendants offered to increase the number of allowable printed copies of source code in order to address Plaintiff's stated needs for streaming Defendants' source code using video chat services, and to allow that source code can be securely transported to the home offices of the two attorneys with children that work remotely, provided that the remaining source code protections can be complied with under the Protective Order. While Plaintiff rejected Defendants' offers, which would moot Plaintiff's complaints, Defendants remain willing to compromise on this issue. This is a far more practical and secure solution than Plaintiff's unprecedented proposal to allow source code to be streamed electronically over video chat.

Plaintiff's demand that the secured Source Code Computer be used during the course of depositions (§ 9(l)) again introduces an unnecessary security risk. The Protective Order already contains mutually-agreed provisions for the printing of portions of source code, including a procedure for requests to print more than 25 consecutive pages or more than 500 pages total. Plaintiff provides no basis for its conclusory assertion that the printed copies of Defendants' source code will be insufficient at deposition to require that the entirety of the source code be made available outside of the highly secured and stationary location it will otherwise occupy. *OpenTv, Inc. v. Apple, Inc.*, 2014 WL 5079343, *3 (N.D. Cal. Oct. 9, 2014) (denying request to require source code computer at depositions). Moreover, Plaintiff's proposal fails to consider not only the logistical concerns attendant with transporting a secured computer to other locations, but also the difficulty of a clear record of what a deponent is being asked about during the deposition when an entire code base is available. The Court should accordingly decline to adopt Plaintiff's proposed § 9(l).

### IV. Export Control Provisions (§ 14)

**Plaintiff's Position:** Plaintiff's proposal that a producing party "shall be responsible for identifying any such controlled technical data" and the receiving party "shall take measures necessary to ensure compliance" is supported by the Federal Judicial Center Patent Case Management Judicial Guide, Third Edition (2016). The producing party is the only party able to properly identify material subject to export control, and accurate identification of those documents and applicable regulations (for example, ITAR, EAR, etc.) will allow for appropriate protections. Below, Defendants suggest export control laws would only restrict export "to embargoed countries and nationals of those countries, of which Canada is not included" yet U.S. export control laws, and the language of the protective order, are not so narrow. Defendants' overly restrictive proposal would require treating ***all*** Protected Materials as subject to export control, including non-technical documents. Defendants' proposal needlessly restricts counsel or

approved experts from viewing any Protected Material while traveling in a foreign country (including Canada), and requires additional vetting of vendors to ensure no access by non-US persons, including individuals legally working in the U.S. on a work visa, all of which are unnecessary and unjustified and have the potential to add to the expense of the litigation.

Defendants have not made a showing as to whether any technical documents to be produced are actually subject to any export control regulations. Thus, Defendants' complaints about burden of on a document-by-document basis ring hollow. While Defendants' documents themselves may not need to leave the U.S. in the ordinary course, data storage requirements, including of those of vendors (discovery vendors, court reporters, etc.), are implicated for export control compliance.

**Defendants' Position:** On Monday, April 29, less than a week before the deadline to submit briefing on the disputed provisions in the Protective Order, and a month after the parties had otherwise completed a lengthy negotiation process, Plaintiff proposed additional requirements for Defendants to provide additional disclosures concerning data and information subject to the Export Control provisions (§ 14). Plaintiff now seeks to force Defendants to mark, apparently on a document by document basis, the applicable export control provisions. Such a process is not possible given the volume of documents likely to be produced in this litigation, some of which include encryption software that may be subject to export control. It would be overly burdensome for Defendants to have to review each document for export control purposes where Plaintiff's broad infringement accusations implicate various technology areas.

Plaintiff has suggested that the present export control requirements "artificially restricts the pool of possible experts." This misunderstands the situation. Regardless of the expert control provision included in the protective order, each person and party is required to abide by U.S. export control law and regulations. In any event, presumably, this relates to Plaintiff's disclosure of Dr. Zavadsky, who resides in Canada, as a proposed expert. However, Defendants lodged several objections to Dr. Zavadsky viewing highly confidential information produced in this case, and Plaintiff never even attempted to meet and confer to resolve any of them. Thus, Plaintiff's assertion that the present export control provisions restrict its expert candidate pool is a red herring. Moreover, while Plaintiff complains generally about the scope of export control laws and language of the Protective Order, the fact of the matter is that the fact of the matter is that the relevant export control provisions concerning the encryption technology at issue here would only apply to embargoed countries and nationals of those countries, of which Canada is not included. Plaintiff has not provided any further justification for placing additional burdens on Defendants in protecting the movement of their highly confidential technical information outside of the United States, nor can it. Indeed, Plaintiff and Plaintiff's counsel are based in the San Francisco Bay Area, as are Defendants.