01:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VIRENTEM VENTURES, LLC, )
)
Plaintiff, )
) C.A. No. 18-917(MN)
v. )
)
YOUTUBE, LLC, et al., )
)
Defendants. )

Wednesday, May 8, 2019
3:30 p.m.
Teleconference

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

ASHBY & GEDDES
BY: ANDREW COLIN MAYO, ESQ.

-and-

BUNSOW DE MORY, LLP
BY: CHRISTINA M. FINN, ESQ.
BY: DENISE M. DE MORY, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

RICHARDS LAYTON & FINGER, PA
BY: FREDERICK L. COTTRELL, III, ESQ.

-and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
BY: DAVID A. PERLSON, ESQ.
BY: JOHN W. McCAULEY, ESQ.

Counsel for the Defendants

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE: The following telephone conference was held in chambers, beginning at 3:30 p.m.)

03:30:25

03:30:29 THE COURT: Good afternoon, counsel. Who is there, please?

03:30:33 MR. MAYO: Good afternoon, Your Honor. Andrew Mayo from Ashby & Geddes on behalf of the plaintiffs this afternoon. And I am joined by my co-counsel from Bunsow De Mory, you have Denise De Mory and Christina Finn on the line.

03:30:46 THE COURT: Welcome to all.

And for the defendant?

MR. COTTRELL: Good afternoon, Your Honor. Fred Cottrell from Richards Layton in Wilmington for the defendants. From Quinn Emanuel my co-counsel, David Perlson and John McCauley.

THE COURT: Okay. Welcome to you all as well.

So I have reviewed the joint letter that was submitted, and now is your opportunity to tell me anything else that you think I need to know. So I guess why don't we just walk through each of the four issues for the protective order, and some of them defendants went first, some of them plaintiffs went first, so why don't we just stick with that.

So if we start with the experts and professional vendors, I'll hear from defendants first.

MR. PERLSON: Thank you, Your Honor. This is David Perlson. I think that this is actually a pretty straightforward issue. And I guess I'll take up these in turn. First of all, the current and anticipated employees of a party's competitor. I mean, it doesn't seem like it should really be a matter of controversy that a competitor shouldn't be an expert in a case. I mean, one of the main points of a protective order is to protect against information getting to a competitor, the people who can actually use the information against the party disclosing it.

03:32:23 And to allow a party to provide an expert materials simply because that competitor has been retained as an expert in this case just completely undermines the whole point of a protective order.

03:32:44 THE COURT: What's the problem of a past employee of a competitor who is no longer working for a competitor?

03:32:51 MR. PERLSON: We're not seeking to exclude that.

03:32:54 THE COURT: Isn't that in your proposal, is not a past or current employee of a party?

03:32:59 MR. PERLSON: The past -- so that I'm talking about the competitors now.

03:33:03 THE COURT: Current employee of a party's competitor. What's the problem with a past employee of a party who is no longer working for that party?

03:33:11 MR. PERLSON: Well, I think that is an -- as been discussed in the *Corley versus Google* case that we cited that's in the Northern District of California, basically they have, you know -- there is, this is what the Court -- I'll just read to you that which I think is useful. The Court has repeatedly ruled that it is usually improper to hire an opponent's former employee as an expert because such an expert is substantially likely to inflict unfair prejudices which the former employee cannot realistically discover or guard against.

03:33:50 Basically they're in a position of being able to have this former employee ask them whatever they want about anything that has -- it's not even bounded by what's been produced in the case. So it really in some ways goes beyond the unfairness of providing this material that they might have seen before.

03:34:17 THE COURT: How do we know who a party's competitor is?

03:34:24 MR. PERLSON: Well, I don't think that that really is something that's particularly difficult to figure out. It's someone operating in a space of the business of a party. I mean, as a practical matter, you know, this obviously is something that is more of an issue in relation to defendants because they are the ones that have competitors.

03:34:48 THE COURT: Right. But I guess my question is, if they identify an expert and you say nope, he's an employee of one of our competitors, how does determination get made? If defendants say that we don't think he's a competitor, you come to me?

03:35:07 MR. PERLSON: Well, I guess it would be, yeah. And I have a hard time believing that that's going to be that hard to figure out. You know, if it's someone who is working in the same space as what's being accused for a competitor, then, you know, then that would be a legitimate

03:35:26 objection by us. We would say -- I mean, I think that -- I think what's most important, I think that what all these cases recognized universally and plaintiff has not cited a single case to the contrary is that you can't give information to a competitor. So I think that the most important thing for Google and for defendants is that this information doesn't get to a competitor.

03:35:52 THE COURT: Why is Section 7.5 not sufficient for you to raise any issues you have with a potential expert?

03:36:01 MR. PERLSON: I think that what we'd rather just have at the beginning I guess established as it's frankly commonly agreed, and we just never had this even raised before as an issue before ever as being difficult that you can't hire a competitor in advance. Part of this is setting the ground rules for the case.

03:36:21 THE COURT: But I don't know who a competitor is. You want me to issue an order that says a competitor, and you're telling me that if there is a dispute you're still going to come back to me, so I'm wondering why isn't 7.5 which allows you an opportunity to object to a potential expert not sufficient to protect you against the harms that you're afraid of?

03:36:45 MR. PERLSON: Well, for one thing, certainly to the extent that there is a suggestion that it's okay for a

03:36:51 competitor to view these materials, that is a problem. I think -- I suppose if we had a ruling or at least an agreement that it's not okay for a competitor to be an expert and then I guess down the road there is a dispute as to whether or not someone is a competitor, then you know, maybe it isn't that different if we object to it later. But I think that it's important to have the ground rules up front to say hey, it's not okay for them to go hire someone from Google's competitors.

If we want to kick the can down the road and have a dispute what is or is not a competitor, as long as we're all operating under the same presumption that is universally adopted by courts and is just common sense that you can't hire a competitor as an expert, then you know, maybe as a practical matter it doesn't make a difference.

But we just think that, you know, at least in terms of the protection, but as a practical matter it just seems easier up front to declare that you can't have a competitor now. And that's frankly what we've done in the past and this is the first time I have actually ever had a plaintiff in my recollection to object to being able to -- a bar on hiring a competitor.

THE COURT: All right. Before we go to professional vendors, what's plaintiff's position on what Mr. Perlson just said?

MS. FINN: Thank you, Your Honor. This is Christina Finn. Plaintiff's position is I think very much in line with the questions that Your Honor was just posing. The provisions that defendants propose are not as narrow as they seem to be suggesting. And, in fact, the definition of experts is not limited, or the exclusions that they proposed are not limited to competitors that are in the same space as what is being accused, but rather are any competitors of any defendants.

This is Google and YouTube that we're talking about. And for, Mr. Perlson, when he was asked to define what a competitor of the defendants would be defined as, he suggested that it is anyone that is operating in the same space as the defendants. And with respect to Google and YouTube, you know, that covers most of the companies that are currently operating that have any sort of web presence. And this could be demonstrated by defendant's current objections to a proposed expert of plaintiff's based on the fact that he's a consultant for companies, and for example, helping them with their mobile presence or other sort of infrastructure related to technology.

It is plaintiff's position that the provisions in Section 7.5 are perfectly sufficient to allow defendants to provide specific objections to experts that we may propose for access to confidential information. This is not

a blanket exclusion or definition of who could be an expert in this case or who the plaintiffs can hire as an expert. Plaintiffs can certainly hire defendant's competitors as experts if they weren't given access to confidential information and there is nothing in this protective order that would prohibit that.

Additionally, it's defendant's position that courts don't allow competitors to be experts at all, or a suggestion along those lines is undercut by their own case which they cite, *Gillette versus Dollar Shave Club*, in which an employee of a competitor of both parties was allowed to be an expert in that matter with respect to validity, but was not allowed to be given access to confidential information in that matter.

And in that matter there was no definition from the outset as to who could be an expert. And instead, the parties took the dispute to the court under a provision very similar to the one the parties have agreed to in Section 7.5 here.

THE COURT: Go ahead, Mr. Perlson.

MR. PERLSON: Let me respond really quickly.

First of all, I thought we were talking about being an expert who could see confidential information. If there is something in here that we have missed that says who could or couldn't be an expert in a case beyond that, maybe

03:41:50 that's something we can address. I didn't really understand that was an issue.

03:41:56 You know, I think as a practical matter, there may be issues, you know, even beyond the protective order issue as to whether an employee could be an expert for other reasons. But that's not what we're trying to address here.

03:42:14 And in that case, in the case that they're citing, really that just makes our point. In that case they said that that same -- I think that's the *Corley* case that -- or *Gillette*, it's one of the cases that we cited. And in that case it acknowledged that the -- plaintiff has demonstrated good cause to support its objection, including that the expert wasn't until recently an employee of one of plaintiff's competitors and it said that they couldn't see the confidential information. It says that they could, maybe if they want to be an invalidity expert, they could do that. And that's entirely consistent with our position. We're not trying to exclude who could be an expert at all, it's who can be an expert allowed to view materials under the protective order. So to the extent that there needs to be some revision that resolves that issue, I didn't think that's what was at issue, but to the extent that's at issue, that's resolved very easily.

03:43:20 THE COURT: Tell me about the professional vendors. I don't quite understand who you're talking about

that you're worried about being a competitor or an employee of a competitor, so can you enlighten me?

MR. PERLSON: This, too, I don't really think should be much of an issue. I think it's unlikely that plaintiff would hire someone as a vendor in this case like -- I mean, I would suspect that the vendors would be copy people or electronic discovery people or that sort of thing. I don't anticipate that those would be competitors, but it's really just an attempt to avoid an end run around something, you know, a preclusion from people being competitors and seeing our confidential information by labeling them as something else. I mean, that's all it is. It's just, we're just trying to limit the people who can see the information. And you shouldn't be able to show a competitor information just by virtue of the fact that you call them a vendor.

THE COURT: Plaintiff, what's your position on that one?

MS. FINN: Your Honor, our position is that well, to start, the provision that or the arguments that Mr. Perlson is making do not approach or discuss the entire scope of the limits the defendants seek to impose on professional vendors. It says that no past employees that were parties, that means no past employee of Google or YouTube ever. Google currently has approximately a hundred

03:44:59 thousand employees. I'm sure they have quite a few past
03:45:04 employees as well. It doesn't limit the past employees that
03:45:07 are operating in the same space of the accused technology or
03:45:11 even limit them to being involved in technology at the
03:45:16 defendant's at all. It could be a past employee in the
03:45:21 cafeteria at Google that now is an employee at a discovery
03:45:26 vendor. And under the language that defendants propose,
03:45:29 that would be a violation of a court order.

03:45:33 And there is simply no way for the plaintiff to,
03:45:37 nor should the plaintiff have to guard against those types
03:45:40 of situations.

03:45:41 And it also says that it is not -- that they may
03:45:44 not be current employees or competitors or anticipated to be
03:45:48 employees of a competitor at the time that they're hired.
03:45:52 When we're talking about professional vendors, the scope of
03:45:56 that provision is extremely broad, very difficult and time
03:46:00 consuming to investigate on plaintiff's behalf, as well as
03:46:07 not nearly tailored to protect against inadvertent
03:46:12 disclosure, because the vendors that are involved are simply
03:46:15 going to be acting as vendors and will have safeguards in
03:46:19 place to prevent the disclosure of confidential material
03:46:24 here. So we just think that this provision rather than
03:46:28 being designed to protect defendant's confidential
03:46:31 information is instead designed to put up hurdles and
03:46:37 obstacles to plaintiff's ability to work this case and hire

03:46:42 vendors and experts.

03:46:45 MR. PERLSON: If I could just respond briefly.
03:46:48 David Perlson again.

03:46:49 THE COURT: Okay.

03:46:50 MR. PERLSON: First of all, we don't know
03:46:54 necessarily who these vendors are. I mean, I think that
03:46:59 there would be -- they would be able to hire these people
03:47:04 without even disclosing them. It's not like one of these
03:47:08 disclosed experts. I think that it's even more of a concern
03:47:11 with them that it be made clear that a competitor is not
03:47:17 someone who they can disclose to. And I think that -- these
03:47:23 far reaching janitor examples is not really credible, not
03:47:30 grounded in anything specific. And again, it's just
03:47:34 something that no one has ever raised in any case. They
03:47:37 have never heard of an issue of someone having a problem
03:47:40 finding a copy vendor because they are a competitor of
03:47:43 Google or of YouTube.

03:47:45 These are -- they're asking for and will be
03:47:48 asking, have asked and have produced some of the most
03:47:52 confidential information we have, source code, the crown
03:47:56 jewel. It's not fair for them to be able to hire someone
03:48:00 that is a competitor under the guise of it being a vendor.
03:48:06 We would never have any idea. That is just above and beyond
03:48:10 anything that, you know, we have ever seen in a case. And
03:48:14 they don't have any case law to support that that's ethical.

THE COURT: Do you have any case law to support that anyone has ever put these limitations on a litigation support service like a photocopy service?

MR. PERLSON: I have never -- I'm not sure that anybody has objected because why would anybody. Just because it hasn't been litigated doesn't mean there is any other cases. I could probably find protective orders if that would be useful.

THE COURT: You had your chance to do that and you didn't do that. So here is what we're going to do. I am going to adopt plaintiff's proposals for 2.7 and 2.15.

With respect to the experts, I think that Section 7.5 which allows the defendants to object to an expert covers the issue. In fact, I think that the law is pretty clear that, you know, while as a general rule competitors shouldn't be acting as experts, if a defendant objects, then the defendant is supposed to make a particularized showing showing the risk for a given expert rather than just something broadly, just broadly saying an expert.

I also have concerns that the definitions that defendants have proposed for a party's competitor are too vague to be put in an order that someone could unintentionally violate.

So I'm going to go with plaintiff's proposal on

experts.

And with professional vendors, I do take the point that these people won't be disclosed. But we're talking about -- it specifically says litigation support services, and the types of services there aren't things that you would typically worry about a competitor being involved in. And so I'm going to go with plaintiffs on that.

Now, let's talk about the acquisition bar.

Defendants.

MR. MCCAULEY: Thank you, Your Honor. This is John McCauley on behalf of defendants.

On the acquisition bar, in our papers we made a particularized showing that there are risks here of inadvertent disclosure which is what is required for the imposition of these types of prosecution and acquisition bars under *Deutsche Bank*. And what we didn't get in response was any kind of actual argument that there is any prejudice here which is the other side of the balancing that would take place under these cases.

And so with the showing that we made, we believe that there is grounds here for an acquisition bar due to the relationships with patent monetization entities in the past and the disclosures to this point of experts who frankly are not the types of computer science experts you would expect to see but are patent savvy individuals who have prior ties

to either, you know, work involving patent acquisition or patent assertion. So in addition to that, we don't think that this is a situation where it can be addressed through objections because the bar is a limit on what an individual can do after they receive the information.

And so, you know, with that, we think that the more appropriate course would be to have the bar in place at the outset so that the rules are set in terms of what an individual can and cannot do with information, highly confidential information, again, as Mr. Perlson discussed, the crown jewels here, the source code, what an individual can do with that information after they are given access to it.

THE COURT: Right. Again, I have a concern with the breadth of what you're proposing here which includes the technology, you know, specified technologies, or any technology that deals with the subject matter of the patents-in-suit, or any technology analogous to functionality found in the Google or YouTube technical information designated highly confidential attorney's eyes only or source code. I don't know what that is. And I hesitate to put something like that in an order when again, technology analogous to functionality found in any document that you all designate that way, that seems too broad to me.

MR. MCCAULEY: Well, and your point is well

taken, Your Honor. And frankly we could have engaged with plaintiff further on this, but during the meet and confer, we had an acquisition bar in our initial draft, they struck it, we put in a different version of it in our second draft that was trying to conform with the language of the prosecution bar that they had proposed. They struck it again and took the position that we're just not going to engage on the acquisition bar discussion because we don't think it's warranted here. We don't think that it's supported in Delaware. So that's where the discussion ended. And that's why the language is the way it is.

And in the proposal, you know, as we state in our papers, we're open to a discussion with plaintiff on narrowing the scope. We would -- at this point we would like a ruling that would say that the acquisition bar is appropriate and we would be happy to engage further with them on what the proper scope would be, including queuing it exactly in line with the prosecution bar language that we did agree to prior to submitting the actual -- prior to submitting any disputes to the Court.

THE COURT: And just so I understand, so your proposed acquisition bar would also apply to the attorneys on the case so the plaintiff's law firm and plaintiff's attorneys?

MR. MCCAULEY: Yes, I think that that's the

normal way that these things would go is that anybody who has access to the technical information would have a -- the bar would apply to them. And again, here, we didn't -- there was no argument from the other side that that would cause any prejudice and we haven't heard of any discussion on that front from plaintiffs.

THE COURT: What's plaintiff's position?

MS. FINN: Your Honor, this is Christina Finn for plaintiff. And our position is first, I don't recall the back and forth as to a narrower scope or acquisition bar that Mr. McCauley is suggesting. I'm not saying it didn't happen, that's just not my recollection that there was ever a narrower acquisition bar that was proposed. It is true that we said from the outset that we did not believe that an acquisition bar was necessary or appropriate in this case, and that it was our understanding that they are not typically allowed in Delaware and so we did not see a need or a reason to so limit ourselves and our local counsel and all of our experts to the acquisition bar as proposed by defendants absence the showing of any particularized risk of inadvertent disclosure as is required under the case law.

If the defendants can show that there is a particularized risk as to inadvertent disclosure or other reasons for an expert we propose, then they can make those objections under 7.5 explaining those reasons. And if, in

fact, that expert is not allowed to view confidential materials, then the risk of inadvertent disclosure disappears. The acquisition bar is drafted by the defendants, and without any proposed modifications since we raised the breadth in our initial briefing, at any time since then, is not limited to acquisition of patents to be asserted against Google. It would limit ourselves, our local counsel. It would limit a damages expert in providing any advice to a client with respect to acquisitions of patents, whether it be valuations or otherwise that could be asserted against anyone, whether Google or not, if as you pointed out, Your Honor, it's analogous to technology that's disclosed in any document the defendants produced in this case.

They have full control then over what the scope is once any person looks at a single document that is designated confidential or higher in this matter.

And it's plaintiff's position that the defendants have not met their burden of showing a particularized showing or a risk of inadvertent disclosure in this case. The examples they provide from the past litigation of plaintiff do not -- are simply facts. They don't provide any reason why those facts of six, seven years ago, present a particularized risk of inadvertent disclosure today. And the expert to which they object due to

involvement in IP mining they haven't approved of, that expert hasn't seen any confidential information and as of today that expert won't see any confidential information of defendants. So plaintiffs don't see the actual disclosure.

And, in fact, the prejudice to plaintiff is extremely high. Many experts have expressed tremendous concern with the scope of the acquisition bar as proposed by defendants. And, in fact, if they were comfortable with it, one expert would be reviewing source code right now, but he is not comfortable with the scope of that acquisition bar because as you pointed out, Your Honor, he wouldn't know when he's potentially in violation of that order unless he reviews every single document produced by defendants and there is some sort of inventory as to all the technology that's disclosed. They're practical issues, they're practical issues that are preventing us and experts from having access to the source code and from preparing our case. And it is plaintiff's position that they have failed to identify any actual risk of an inadvertent disclosure that exist in this case today.

MR. MCCAULEY: A few points in response, Your Honor. And, you know, again, we're happy to discuss scope if that be the true concern, you know, as long as we have a ruling in place that an acquisition bar is appropriate, which it is in this case. We have withdrawn our objections

04:00:05 to an expert that they disclosed who is a practicing attorney who has asserted patents in the past for, you know, similar, *Blue Spike* again was a patent aggregation company that sued a host of defendants. So there is harm here of a risk of inadvertent disclosure which is what these bars are designed to protect.

Going to the past affiliations with these patent monetization companies, there was an acquisition bar in the earlier case involving the predecessor in interest, EPL, so this isn't something that is unheard of for plaintiff. It's something that's been imposed in the past. And again, if it comes down to a scope issue, we are happy to discuss scope, but under the facts of this case, the requirements of Deutsche Bank are met. There is a risk of inadvertent disclosure here that would harm defendants.

MS. FINN: Your Honor, if I may respond on just a few points.

THE COURT: No, I think I have heard enough to rule on this one. And that is I am going to adopt plaintiff's position. I agree after reading the cases that acquisition bars are not favored in this district and that in order to have one, the defendants have to make a showing that the absence of the acquisition bar would result in a clearly defined and serious injury to defendants.

Here, defendants have raised four issues. One

is the predecessor in interest disclosed IP Navigation Group as an advisor in prior litigation. The plaintiff in this case has indicated that IP Navigation Group is not an advisor in this case. And I understand from the scope of the protective order that plaintiff would be precluded from providing that company with any confidential information in this case.

Second was that the named inventor on seven of the eleven patents was a named inventor on another patent that was asserted by a different company, eDekka, and plaintiff has said that he basically sold his patent to eDekka and was not involved in the assertion of that patent. But in any event, the bar even as proposed by defendants would not have precluded that from selling that as I understand it, so that isn't a particularized showing.

The other two issues raised by plaintiff have to do with technical experts. And to the extent that defendants have concerns with technical experts who have issues where they think there is going to be a possible misuse of their information, they have the ability under provision 7.5 to object to those experts.

So I am not persuaded that the risk of disclosure here outweighs the prejudice to the plaintiffs as the plaintiff has described it. Moreover, the proposal by defendant is not narrowly tailored and it leaves too much

04:03:32 room for -- too much ambiguity, so I'm going to adopt
04:03:38 plaintiff's position on the acquisition bar.

04:03:41 Source code is the next issue and plaintiffs
04:03:45 went first on that.

04:03:47 MS. FINN: Yes. Thank you, Your Honor. This is
04:03:49 Christina Finn. The source code access that plaintiffs
04:03:54 request in Sections 9(i) and 9(l) relate to practical
04:04:01 considerations and assisting plaintiffs in preparing its
04:04:06 case and in allowing a plaintiff to discover the facts to
04:04:13 support its infringement case.

04:04:20 First with respect to allowing authorized
04:04:22 persons, which is counsel and experts that have specifically
04:04:25 already been approved by defendants or the courts to access
04:04:28 and view defendant's source code, to discuss printouts which
04:04:38 are already limited under the agreed provisions of the
04:04:41 protective order, the end-to-end video chat services such as
04:04:48 Signal or FaceTime.

04:04:49 As we discussed in our papers, we have remote
04:04:52 attorneys with very small children on who it would be a very
04:04:56 significant burden to have travel to our office to view
04:04:59 source code in preparing infringement contentions.

04:05:02 And defendants have failed to identify what risk
04:05:08 there is in allowing this discussion via end-to-end
04:05:13 encryption chat services when the provisions in place are
04:05:19 very similar to those that would be allowed and that are

allowed for plaintiff's counsel to review printed code in their offices.

And so that's our proposal with respect to the end-to-end encryption.

Additionally, with respect to the source code computer, plaintiff simply seeks to have the defendants take the source code computer that's currently located on the -- a floor in their office in San Francisco, put it on an elevator, take it up a few floors and put it into a conference room where a deposition would be occurring. They suggested that doing so would introduce an unnecessary security risk, but they haven't identify what that security risk is or why it would be more risky to have it in a conference room in their office for depositions as opposed to having it in a room for review.

Again, this is a practical consideration. There are 23,000 files the defendants have produced on the source code computer that are available only on the source code computer. And so depositions, it certainly may be the case that if we show a deponent a method, a few lines of code, that they may say, gosh, I would need to go look at this other file in order to figure out and answer your question. So that's why plaintiff is proposing including this provision in the protective order and seeks to allow that.

THE COURT: Okay. Defendants.

04:07:07 MR. PERLSON: Thank you, Your Honor. This is
04:07:09 David Perlson again.
04:07:11 First of all, on the discussion of having --
04:07:18 discussing source code over CAD and dealing with the
04:07:22 situation of having attorneys who are not in the office or
04:07:28 working elsewhere, we have provided a solution for that. We
04:07:33 said we're willing to give you additional hard copies, just
04:07:37 keep them locked up just like you would in the office. And
04:07:41 that exact same discussion can be had with lawyers on one
04:07:46 end on the phone and the lawyers on the other end on the
04:07:50 phone, or I guess if you wanted to do it over, I don't know
04:07:54 specifically how it would work with a chat line, I don't
04:07:57 know how that would be necessary. But to the extent they
04:08:00 need to talk about it, they can talk about it right in front
04:08:03 of them.
04:08:03 I'm looking at page two right now, line three.
04:08:07 Yeah, I'm there too.
04:08:08 What do you think about this?
04:08:11 That's the practical solution to the issue
04:08:13 without risking dissemination beyond the hard copies that
04:08:22 the default order allows and is generally limited to. There
04:08:29 is a reason why there is restrictions and you keep these in
04:08:33 hard copies because they're easiest to track, and you're
04:08:39 able to keep a -- the crown jewels protected. Once you
04:08:45 start sending things over the internet through services,

various services that the risk increases. That's a fact. And there is just no reason for it because we provided the solution.

THE COURT: What about the source code computer at the deposition, what is your response to the point that was raised about, you know, what if you're showing it to a witness and the witness says gosh, I can't answer that, I need to go back and look at something. Shouldn't that be available? What's the response?

MR. PERLSON: Well, first of all, if I could say it's not a matter of putting something on an elevator and moving it up a few floors. In the case of San Francisco, the witnesses are maybe somewhere else, so it's not necessarily everything that's going to be in our office is a practical perspective. As the other perspective, that's what you have the printouts for and you get the stuff that needs to be printed out. This is the exact issue that was raised in the *OpenTV versus Apple* case that we cite and the court found that OpenTV found that it preferred to be available in printed and electronic format, but it can see the printed source code, I portions of code and create a clear record to witness's testimony N get that) you know, there can be any number of situations, not just source code where a witness might refer to something else, I'll note that as a practical matter they don't cite to any specific

example where this has ever occurred or any case in which a court has allowed what they're proposing. And there is no reason for, subject to the extra risk, I'll say as a practical matter what is going to make a mess of a record. How are you going to keep track of a report of a source code which isn't a static thing? You know, they will likely make additional requests for source code throughout the case. And it's not going to be one thing, one record. You can't put 23,000 files in the record. That's not going to work.

And as a practical perspective, what they're proposing in the unlikely hypothetical event that this might occur with no evidence that it's ever occurred before is we think a striking departure from what has been allowed before and it's just going to open the floodgates. If that's the ruling, then every plaintiff is going to ask for this, and then there is going to be less restrictions on source code, and then, you know, it's going to go down from there. There is a reason why only the printed copies are there, they work, there is no evidence that they don't work other than this conjecture. And they haven't identified any basis to go beyond what is the default in Delaware and no cases to suggest that it should be departed from.

THE COURT: Okay.

MS. FINN: Your Honor, if I may address the practical considerations with respect to the source code

computer at depositions?

THE COURT: Sure.

MS. FINN: The defendant's position that somehow the source code that is produced by plaintiff is not static and will be changing is just false. The files that they have produced will not change. The path names of each individual files will not change. They are easily read into the record. And there are lines for every file with source code, that's the way that source code is constructed, they can be referred to by path name and line number for purposes of the record.

Defendants have access to exactly the same source code that they provided as such that they would easily be able to identify, what is being referred to on the record.

With respect to defendant's suggestion that this has never ever happened before and there would never be a reason for it to be such, to be required, we have been involved in cases in which the defendants have made source code available during a deposition where a source code computer has been shipped from one location to another for exactly that purpose. We're not discussing that here, we're requesting that the defendants make the source code available in the same office in which it now resides for their witnesses which they have previously suggested will

04:13:37 most all be located within the San Francisco Bay area. They haven't provided any reason why those deponents could not be made available for a deposition at Quinn Emanuel's office in San Francisco. And the same should be true of the experts.

04:13:56 They have a motion to transfer pending to have the entire case moved to the very location where the source code computer now resides because their witnesses are apparently located here, but they're not willing to make those same witnesses available in their office and with a source code computer available. Again, these are practical considerations with practical solutions and they don't pose any additional security risk that defendants have been able to identify.

04:14:28 MR. PERLSON: Your Honor, if I could --

04:14:29 THE COURT: No, I think I can rule on this one. And with respect to the source code access, I am going to adopt the defendant's proposals. I agree with the defendants that we're talking about source code here, and it is some of the most important documentation that a company possesses. And that it should be limited. So I am not going to allow pictures of documents to be shown over a -- streamed over video chat because there could be some risk to that that I'm not appreciating.

04:15:09 Now, defendants have said that they would allow additional copies made so that as a practical matter can

address the issues that plaintiff has raised, and I would encourage you to discuss that and come up with a workable solution with number of copies that can be made of documentation.

And similarly with respect to the use of the source code computer at depositions, I think that plaintiff has not cited to any case law. Defendants have cited to the *OpenTV versus Apple* case which I have reviewed and I agree that while plaintiff is talking about some practical aspects, I do think there is a practical reason to not have just things put up on the computer in the middle of the deposition. And we should have a record that is clear based on the documents that have been produced.

So with respect to source code I will adopt defendant's proposal.

Next, export control provisions.

Plaintiff.

MS. FINN: Yes. Thank you, Your Honor. Christina Finn. The request that plaintiff makes here is a pretty straightforward one. We simply request that the defendants identify which documents they produced that are actually subject to export control and which export control provisions that they are subject to.

Export control provisions are strict liability and require certain practical steps to be taken in order to

comply, and so plaintiff and defendants are the only ones that are in possession of the information as to which export control provisions apply to their documents, if any.

Defendants have identified in their final response in the joint motion, or I'm sorry, in the joint letter, they have identified encryption technology as being the subject of export control. And so that would seem to be something that defendants could easily identify which documents fall into that export control provision such that plaintiff can take appropriate steps to comply with that particular document. And that's all that we seek here for the defendants to just provide that information, which they are in possession.

THE COURT: But that would actually make the defendants go through every -- I mean, I assume you're asking for pretty broad requests and you're expecting the defendants to go through every page that it produces and tell you whether it's subject to export controls and which ones, and that just seems quite burdensome to me. Why is it not too burdensome?

MS. FINN: Well, defendants have yet to let us know if there actually are any documents that they're producing that are subject to export control. So I don't yet have any idea what burden there is to do that, to do that identification, because you know, we don't even know if

there are documents that they're producing that are subject to the export control. And presumably, if it's every single document, and they can make that showing, then that's one thing, but if it's really just a limited subset and those would seem to know something, documents that are easily identifiable by defendants and they have to review these documents for other matters on a document-by-document basis anyway, or in categories such that identifying this information doesn't seem to be anymore burdensome than identifying whether confidential, heavily confidential or potentially privileged.

And Google has to keep this information as a corporate entity anyway so that they can identify which of their documents can be accessed by foreign nationals or under work visas or documents that can be hosted on servers that don't reside within the United States. So they have these -- they should have these controls at their own premises, and so should be able to identify those provisions and controls for plaintiff to be able to comply as well.

THE COURT: Okay. Who is going to speak for defendants on this?

MR. PERLSON: This is David Perlson again.

So I guess first maybe just catching the last point first. As a practical matter, that's not how the export control has worked. It's not like let's take the

source code, for example, it's 28,000 files, it's not like at the front of each file it says this is subject to export control. It's not something that individual employees are able to do. And frankly I'm not sure that that would be something that would even -- we have people who are viewing these documents, that's not something that they're even capable of doing.

There are over -- obviously Google takes measures to protect as it needs to, but those are global measures in relation to more macro issues. It's not done on a granular basis like that. It would have to be redone and there is no practical reason why when Google is producing the 28,000 files that relate to the broad categories of technology that plaintiff has generally accused in this case, no one went through every single one of those and identified which would or wouldn't be under export control. And I'm not sure how you would possibly do that. So that really goes to your point.

And in terms of what subject matter may be covered by it, I think we did identify that at least some of this encryption technology would be in there. And again, it's not practical for us to go in and look at 28,000 different files, however many lines of code, and parse that out.

THE COURT: Anything further from the plaintiff?

04:21:49 MS. FINN: Your Honor, we're not suggesting that
04:21:53 they would have to identify on a file-by-file basis which
04:21:57 files in the first code that they have produced are subject
04:22:02 to export control. If there are categories that are,
04:22:05 certainly those categories could be identified. The only
04:22:08 category that defendants have identify so far is encryption
04:22:13 technology, which is not technology that is, you know,
04:22:18 squarely accused in this case.

04:22:19 And so -- and defendant's suggestion or
04:22:24 Mr. Perlson's suggestion that defendants don't keep track of
04:22:28 which documents are subject to export control on a micro
04:22:32 level, but rather just have global macro provisions in
04:22:37 place, just, I don't know what those are, and if he's
04:22:42 suggesting that they don't employ people outside of the
04:22:46 United States, then you know, I just -- I find that hard to
04:22:50 believe that they don't have some provisions in place with
04:22:52 respect to documents that can be accessed by those that are
04:22:57 -- fall within export control provisions and those
04:23:02 individuals that do not.

04:23:04 THE COURT: Okay. I think with respect to this
04:23:07 one, I'm going to adopt the defendant's proposal. It seemed
04:23:14 from the papers as if the parties were initially fine with
04:23:19 not having anything and then this kind of came up at the
04:23:22 last minute. But I do agree that it is extremely burdensome
04:23:28 for defendants to have to go through and figure out what

documents are subject to export controls because while the company may have some general views on that expecting the folks who are doing the document production to do it and to do it in a way consistent with the way the company would want in all occasions seems rather difficult. So I don't think it's something where we could just say oh, well, while you're reviewing them for privilege and relevance, you should also include on there a designation with respect to export control.

So I think what I would say is that to the extent you all want to have something about export control, that the parties should abide by the laws and regulations related to the export of technology information. And to the extent that plaintiff has a question about particular documents, they should ask the defendant and defendant should respond in a prompt manner as to whether or not they believe that those are subject to export control.

Okay. I think that deals with the four issues that we had in the letter. Is there anything else?

MR. PERLSON: This is David Perlson. Not from defendant's end.

MS. DE MORY: Your Honor, I think there is one other issue that we wanted to raise. This is Denise De Mory. It is the issue of -- because of this acquisition bar, plaintiff has effectively been precluded from having

04:25:14 any experts review source code or any of defendant's technical documents to this date because they would only allow us to provide access to an expert, even the one that has been approved by them if the expert would sign off on the -- their proposed protective order.

04:25:36 And we just submitted an order today agreeing to an additional week to do the infringement contentions largely -- and selection of claim limitations largely pending the outcome of this hearing. So I raise that issue now. We will work with defendants to see if we can work something out. But effectively, you know, as of the ruling today, we essentially have one week for experts to now have access to information because we just got this clarity on the protective order and up until now we haven't been able to have any experts review any confidential documents. It's not just infringement contentions, but I think actually the more significant issue is actually that we're in a position where we've agreed to this limitation procedure so that we're limiting our claims contemporaneous with the infringement contentions, so that is an issue we will continue to discuss with the defendants, but may be something that results from the rulings today.

04:26:42 THE COURT: Do defendants want to add anything?

04:26:46 MR. PERLSON: This is David Perlson. I'm not sure what to say, Your Honor. We gave them a week,

submitted a stipulation to that effect that was entered. This comes as a complete surprise that this is being raised. I don't think there is any reason to engage on it further today.

THE COURT: Okay. All I will say on that point is that I would hope that the parties could discuss and be reasonable. I don't mind reasonable extensions of time so long as they don't impact the parties' schedule too much or the Court's schedule. And so I would hope that you could agree on something.

And also, I would expect if you get an extension on the time for discovery, that whatever contentions come with it will be rather fulsome and based on the access that experts were allowed and given time to come up with their contentions.

MR. PERLSON: Okay. Your Honor, this is David Perlson. Just to be clear, we did agree to -- it wasn't the full extension that they asked for, but we did agree to an extension which is why I'm surprised that this is being raised on the fly without any particular request.

THE COURT: I appreciate that. I'm just saying you guys should talk and if a week is not enough, then I would expect you guys to come up with something that is reasonable. And I'm also given the plaintiff warning that if they get an extension, I will expect them to use that

04:28:22 extension to get something more fulsome to you. Okay?
04:28:28 Anything else?
04:28:31 MS. FINN: Nothing from plaintiff, Your Honor.
04:28:35 THE COURT: Then thank you very much. Have a
04:28:38 good evening.
(Teleconference ended at 4:28 p.m.)