IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VIRENTEM VENTURES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 18-917 (MN) |
| | ) |
| YOUTUBE, LLC and GOOGLE LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM ORDER

At Wilmington this 13th day of December 2019:

IT IS HEREBY ORDERED that the claim terms of U.S. Patent Nos. 7,683,903 ("the '903 Patent"), 8,068,108 ("the '108 Patent"), 8,345,050 ("the '050 Patent"), 9,785,400 ("the '400 Patent"), 6,598,228 ("the '228 Patent"), 7,100,188 ("the '188 Patent"), 6,801,888 ("the '888 Patent") and 7,299,184 ("the '184 Patent") with agreed-upon constructions are construed as follows (*see* D.I. 125, Ex. A at 1-2):

1. "concepts [for a portion of the audio or audio-visual work] / concept information / conceptual information content" means "written transcript, raw text, keywords, phrases, or other representations of conceptual information" ('888 Patent, claims 15 & 17; '184 Patent, claims 5 & 22; '228 Patent, claim 7)

2. "presentation time parameter / the presentation time parameter" means "'the presentation time parameter' is the same presentation time parameter as 'a presentation time parameter'" ('903 Patent, claims 1, 3, 12, 13 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 3, 8, 20, 25 & 36; '400 Patent 1, 3, 12 & 14)

3. "data time parameter / the data time parameter" means "'the data time parameter' is the same data time parameter as 'a data time parameter'" ('903 Patent, claims 1, 4, 7, 12, 13, 17 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 4, 8, 20, 25 & 36; '400 Patent, claims 1, 4, 7, 12, 15 & 18)

4. "default" means "normal" ('903 Patent, claims 1, 12, 13 & 22; '108 Patent, claims 1, 3, 5 & 7; '400 Patent, claims 1 & 12; '050 Patent, claims 1, 8, 20, 25 & 36)

5. "state values" means "a value that represents a level of service the user has purchased, or the feature set or model of user system purchased by the user" ('188 Patent, claims 1, 2 & 4)

Further, as announced at the hearing on December 2, 2019, IT IS HEREBY ORDERED that the disputed claim terms of the '903, '108, '050, '400, '228, '188, '888 and '184 Patents, as well as U.S. Patent Nos. 8,566,885 ("the '885 Patent"), 7,043,433 ("the '433 Patent") and 9,185,380 ("the '380 Patent") (collectively, "the Patents-in-Suit") are construed as follows:

1. "time-scale modification / time-scale modified" means "speeding up or slowing down the playback rate" ('050 patent, claims 1, 8 & 20; '228 Patent, claim 33; '885 Patent, claim 1; '888 Patent, claims 15, 17 & 18)

2. "presentation rate" means "the speed at which media is played back in a time-scale modification system" ('903 Patent, claims 1, 7, 12, 13, 17 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 8, 20, 25, 34, 36 & 45; '400 Patent, claims 1, 7, 12 & 18; '228 Patent, claims 4, 5, 7, 9, 12, 13, 14, 17, 31, 33 & 34; '188 Patent, claims 1 & 7; '885 Patent, claims 1, 11 & 13; '433 Patent, claims 1, 2, 3, 4, 7, 8 & 9; '184 Patent, claims 1, 16 & 17; '380 Patent, claims 1[*] & 2)

3. "time-scale modification rate" means "the speed at which media is played back in a time-scale modification system" ('888 Patent, claims 15, 16, 17 & 18)

4. "conceptual speed association data structure" means "a data structure that pairs a concept and a TSM rate or a concept and a presentation rate" ('184 Patent, claims 5, 16 & 22; '888 Patent, claims 15 & 17)

5. "guidance information" means "information that is used to communicate a playback rate for an entire media work or one or more specific portions of the media work" ('228 Patent, claims 3[*], 4, 7, 12, 13, 14, 16, 17, 31 & 34; '188 Patent, claim 1; '885 Patent, claims 1, 11 & 13)

6. "current time" means "a current position in the media content that can be expressed either as the time elapsed since the beginning of the media content presentation or as a location in the media content stream that is currently being played" ('903 Patent, claims 3, 4, 12 & 22; '050 Patent, claims 3 & 4; '400 Patent, claims 4, 14 & 15)

---

[*] Indicates that the claim is not asserted, but it is included because the term appears in the unasserted claim and at least one of its dependent claims is asserted.

7. "rending system" means "a system for rendering temporal sequence presentation data" ('903 Patent, claims 1, 2, 12, 13, 14 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 2, 8, 20, 25 & 36; '400 Patent, claims 1, 2, 12 & 13)

8. "portion(s)" means "a part of any whole, either separated from or integrated with it" ('903 Patent, claims 1, 7, 12, 13, 17 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 8, 20, 25, 36, 40 & 41; '400 Patent, claims 1, 7, 12 & 18; '888 Patent, claims 15, 17 & 18; '433 Patent, claims 1, 2, 3, 7, 8 & 9; '184 Patent, claims 5, 8, 16, 17 & 22; '380 Patent, claims 1[*] & 2; '228 Patent, claims 5, 9, 12, 13 & 16; '188 Patent, claim 1; '885 Patent, claim 11)

9. "tangibly stored in a . . . computer-readable medium / computer-readable medium tangibly storing" shall have its plain and ordinary meaning, which includes storage in both non-volatile and volatile memory ('903 Patent, claims 1, 12, 13 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1 & 8; '400 Patent, claims 1 & 12)

10. "rate which causes a portion to be skipped" means "a rate of infinity or other indicium that will be similarly translated which directs the presentation system to skip a portion" ('433 Patent, claim 2)

11. "insistence information that specifies a measure of importance of utilizing presentation rate information" means "information that specifies the measure of importance of utilizing presentation rate information" ('228 Patent, claim 17; '885 Patent, claim 1)

12. "speed contour" means "information representing a desired playback rate for an audio or audio-visual work for some or all portions of the work" ('184 Patent, claims 7, 8 & 17)

13. "temporal sequence presentation data" means "data having the following characteristics: (a) the purpose, utility, or semantics of the data is closely associated with its presentation – presentation involves rendering of the data to achieve some effect (including but not limited to constituting a visible and/or audible presentation that can be monitored by a human being); (b) there are a plurality of rendering processes capable of effecting an appropriate presentation of the data; (c) the data comprises a set of elements; (d) each data element has a Rendition Type that corresponds to a type of Renderer that can be used to render the data element – some common Rendition Types are Pulse Code Modulation (PCM) audio, MPEG video, and JPEG images; (e) one or more Rendition Types may be Time-Distinguished Rendition Types – Time-Distinguished Rendition Types are Rendition Types of Temporal Sequence Presentation Data whose intrinsic characteristics and whose natural rendition process make them preferred candidates for defining and maintaining a system-wide Current Time

parameter (note that most audio Rendition Types are Time-Distinguished Rendition Types); (f) associated with each element is a Data Time – the Data Time of some elements may be explicitly represented as part of the element (such elements are called Timestamped Elements), and the Data Time of some elements may be derivable only by performing or simulating an appropriate rendering process on all or part of the Presentation Data (such elements are called Sequential Elements); (g) the elements have a partial ordering, so that when performing rendering operations on the data it is possible to determine i) which data elements to deliver to the Renderers to begin the presentation process; and ii) given that the presentation process has reached a certain point, which data elements to deliver to the Renderers next to continue the presentation process; and (h) associated with each element is a Rendition Period – the Rendition Period is the length of time the rendering process should last for that element, where the Rendition Period of an element may be specified in many different ways, including but not limited to the following: (i) as a value explicitly stored as part of the element, (ii) as a fixed value associated with that type of data element, and stored in a header field of the Presentation Data, (iii) as a fixed value associated with a Presentation System, (iv) a difference between the Data Time of the element and the Data Time of a following element that would be submitted to the same Renderer in the course of presentation (i.e., the element is rendered until there is another element to be rendered by the same Renderer), (v) as a fixed property of the rendering process" ('903 Patent, claims 1, 7, 12, 13, 17 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 8, 20, 25, 31*, 36, 40, 41 & 42; '400 Patent, claims 1, 7, 12 & 18)

14. "media work content properties" shall have its plain and ordinary meaning ('380 Patent, claims 1* & 2; '433 Patent, claims 8 & 9)

15. "component" means "a part of the rendering system as a whole" ('903 Patent, claims 1, 2, 3, 4, 12, 13, 14 & 22; '108 Patent, claims 1, 3, 5 & 7; '050 Patent, claims 1, 2, 3, 4 & 8; '400 Patent, claims 1, 2, 3, 4, 12, 13, 14 & 15)

The parties briefed the issues (*see* D.I. 155) and submitted an appendix containing both intrinsic and extrinsic evidence (*see* D.I. 156 & 157; *see also* D.I. 165, 154, 125 & 118),[2] and

---

[2] The parties submitted several versions of the Joint Claim Construction Chart. (*See* D.I. 118, 125, 154 & 165). The final version was filed on November 25, 2019 in response to the Court issuing its now-standard post-briefing order directing the parties to meet and confer in an attempt to narrow issues prior to the hearing. (*See* D.I. 165; *see also* D.I. 159).

4

Defendants also provided a tutorial[3] describing the relevant technology (*see* D.I. 153). The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 169) and applied the following legal standards in reaching its decision:

I.   **LEGAL STANDARDS**

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of

---

[3] Plaintiff did not submit a tutorial.

the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may

be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II.     THE COURT'S RULING

The Court's rulings regarding the disputed claim term of the Patents-in-Suit were announced from the bench at the conclusion of the hearing as follows:

> Thank you for the arguments today. They are helpful. At issue we have eleven patents in three families,[4] and fifteen disputed claims.
>
> I am prepared to rule on each of those disputes. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decisions that while I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed each of the patents in dispute as well as the earlier '769[5] patent cited in the parties' briefing. I have also reviewed the portions of the prosecution history submitted. There was full briefing on each of the disputed terms. There was an extensive appendix that included papers submitted in the prior litigation. There was a tutorial on the technology submitted by Defendants. And there has been argument here today. All of that has been carefully considered.
>
> Now as to my rulings. As an initial matter, I am not going to read into the record my understanding of claim construction law generally. I have a legal standard section that I have included in earlier opinions, including recently in *Waters Corporation v. Agilent*

---

[4]  The '903 patent family includes U.S. Patent Nos. 7,683,903 ("the '903 Patent"), 8,068,108 ("the '108 Patent"), 8,345,050 ("the '050 Patent") and 9,785,400 ("the '400 Patent"). The '228 patent family includes U.S. Patent Nos. 6,598,228 ("the '228 Patent"), 7,100,188 ("the '188 Patent") and 8,566,885 ("the '885 Patent"). The '888 patent family includes U.S. Patent Nos. 6,801,888 ("the '888 Patent"), 7,299,184 ("the '184 Patent"), 7,043,433 ("the '433 Patent") and 9,185,380 ("the '380 Patent").

[5]  This refers to U.S. Patent No. 5,175,769.

*Technologies, Inc.*, C.A. No. 18-1450. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.

Neither party has offered a definition of a person of ordinary skill in the art for these proceedings, but the parties agree that there are no disputes as to who a person of ordinary skill is that are relevant to the issues before me today.

Now the disputed terms:

The first term is "time-scale modification" or "time-scale modified," which is found in all of the patent families. Plaintiff proposes "speeding up and slowing down the perceived rate of speech while substantially preserving both intelligibility and the perceived pitch for audio and audio-visual media." Defendants propose "playback rate modification."

I will construe this term to mean "speeding up or slowing down the playback rate."

The dispute here is over Plaintiff's attempt to read in "preserving both intelligibility and the perceived pitch."

The terms "intelligibility" and "pitch" do not appear in either the '903 or '228 patent family. In fact, the term "pitch" does not appear in any of the asserted patent families.

Plaintiff attempts to read those terms into time-scale modification through the '769 patent, an earlier patent unrelated to the asserted patents but incorporated by reference in an example in the specification. The '769 patent is about an improvement to prior art time-scale modification methods. That it was an improvement on time-scale modification methods sheds light on what time-scale modification means generally to a person of ordinary skill. For example, the '769 patent states that "[t]he present invention relates to a method of time-scale modification ('TSM'), i.e., changing the rate of reproduction of a signal" before going on to explain the improvement with more particularity.

In litigation involving the '769 patent in California, the term "time-scale modification" was disputed. Plaintiff's predecessor argued that the definition of "time-scale modification" in that patent did not include preserving pitch and argued that the specification of the '769 patent provided a "clear statement" of a definition – one that did not include anything about pitch. It did so in order to argue

8

that the invention in the '769 patent was a specific type of time-scale modification that preserves pitch.

The court in California agreed with the plaintiff in that case and did not read pitch into the meaning of the general term "time-scale modification" and construed the term to mean "speeding up or slowing down the playback rate." The plaintiff in the California case stated that it "proposed a clear definition [i.e., the definition Defendants here propose] drawn directly from the patent specification. . . . In fact the specification [of the '769 patent] very clearly uses the term 'time-scale modification' to refer only to the speeding up or slowing down playback of a signal."[6] The court in California concluded that that construction was supported by the use of the term in the claims and the specification.[7]

I find that Court's reasoning persuasive. In addition, I find that the construction of time-scale modification that does not require preservation of intelligibility and pitch is supported by the intrinsic evidence of the asserted patents here.

For example, the description of "time-scale modification" at column 2, lines 24 through 28 of the '050 specification [in the '903 patent family] states that "Presentation Time and Data Time are identical in traditional players, because traditional players can only present media content at a fixed 'normal' rate. However, when a player is enhanced with a Time-Scale Modification (TSM) capability, it can present media content at various rates."

Similarly, at column 5, lines 12 to 21, the '885 specification [in the '228 patent family] states: "Time-Scale Modification (TSM) methods are used to slow the playback rate of the audio or audio-visual work to substantially match a data drain rate required by Playback System 500 with a streaming data rate of the arriving data representing the audio or audio-visual work. As is well known to those of ordinary skill in the art, presently known methods for Time-Scale Modification ('TSM') enable digitally recorded audio to be modified so that a perceived articulation rate of spoken passages, i.e., a speaking rate, can be modified dynamically during playback."

---

6   (D.I. 157, Ex. D at J.A. 000830 (Plaintiff's predecessor's reply claim construction brief from *EPL Holdings, LLC v. Apple, Inc.*, No. 12-4306 (JST) (N.D. Cal.))).

7   Specifically, the California court found that "EPL's construction is consistent with the specification, which describes time-scale modification as something that can be achieved by either 'time-scale comparison, i.e., a method for speeding up a playback rate of the signal, or by time-scale expansion, i.e., a method for slowing-down the payback rate of the signal.'" (D.I. 156, Ex. B at J.A. 000706 (citing '769 Patent at 1:27-31)).

9

None of these descriptions of time-scale modification mentions preservation of pitch or intelligibility.

That patents in the '888 family refer to intelligibility does not change the result. In the background of the invention of the '888 patent, it states that "[p]resently known methods for Time-Scale Modification ('TSM') enable digitally recorded audio to be modified so that a perceived articulation rate of spoken passages, i.e., a speaking rate, can be modified dynamically during playback."[8] It then goes on to discuss listener directed TSM [or LD-TSM] in which the intelligibility is preserved. That a version of TSM preserves intelligibility does not, however, mean that TSM in general also must.

Similarly, that the '888 patent refers to it being well-known that "presently known methods for Time-Scale Modification ('TSM')" enable modification of articulation rate does not change the analysis. That refers to articulation rate. It's a rate – which refers to speed. And that is consistent with how that term is used in the '888 specification, which refers to articulation rate as, "i.e., a speaking rate, can be modified dynamically during playback."[9]

Finally, I note that Plaintiff's construction is problematic insofar as it requires "substantially preserving pitch." It is wholly unclear what "substantially" means in the context of these patents.

The second term is "presentation rate." I understand that having construed "time-scale modification" that there is no longer a dispute on that term. . . .

\* \* \*

[And] we're going to go with "the speed at which media is played back in a time-scale modification system."

The third term is "time-scale modification rate," which is found in the '888 patent family. Again, I understand there is no longer a dispute on this term. And I [am] going to construe it pursuant to what I think is agreed as "the speed at which media is played back in a time-scale modification system."

\* \* \*

---

[8]    ('888 Patent at 1:36-39).

[9]    ('888 Patent at 1:38-39).

The fourth term is "conceptual speed association data structure" also known as a "CSA data structure," which is found in the '888 patent family. Plaintiff proposes "a stored pairing of a TSM rate and a concept." Defendants propose "a data structure pairing concepts with corresponding playback rates."

The parties agree that a CSA data structure requires pairing of a rate and a concept. They originally disagreed as to whether the rate in question is a TSM rate or a playback rate. The parties, however, agree that the terms are synonymous and thus I understand that there is no longer a dispute on this issue.

They also disagree as to whether the words "data structure" should be a part of the construction.

I will construe this term to mean "a data structure that pairs a concept and a TSM rate or a concept and a presentation rate."

It appears that there are conventional definitions of a data structure. To the extent that a dispute over that arises later, the parties can raise it at summary judgment.

The fifth term is "guidance information" found in the '228 patent family. Plaintiff proposes "information that is broadcast to restrict or direct presentation rates." Defendants propose "information broadcast in conjunction with broadcast information from a broadcast server to restrict, or direct, playback rates at a client device receiving the broadcast information."

The parties agree that the term includes information broadcast to restrict or direct playback or presentation rates. They disagree as to whether that information must be "broadcast in conjunction with broadcast information from a broadcast server" to a "client device receiving the broadcast information."

Defendants take their language from column 27 of the '228 patent. That, however, is not a clear definition – it refers to "an aspect" of the invention. That does not clearly limit it to all aspects of the invention.

In any event, the parties agree that "guidance information" is synonymous with "Presentation Rate Guidance Information" or "PRGI" in the patents.[10] At column 28, lines 42 to 44, the '228 patent states that "PRGI is information that is used to communicate a playback rate for an entire media work or one or more specific

---

10  (*See* D.I. 155 at 30 n.10).

portions of the media work." It then goes on to specify embodiments of what the presentation information may be comprised of. The language stating what PRGI is, however, is not an embodiment. It is a definition, and I will adopt it.

The sixth term is "current time" found in the '903 patent family. Plaintiff proposes "current position in the content that can be expressed either as the time elapsed since the beginning of the media content presentation or as a location in the media content stream that is currently being displayed and rendered." Defendant propose "current position in time in the media content that is being displayed and rendered."

I will construe it to mean "a current position in the media content that can be expressed either as the time elapsed since the beginning of the media content presentation or as a location in the media content stream that is currently being played."

This term was construed by the court in California during earlier litigation involving the '903 patent to have this meaning. And I agree with that court's construction and rationale.

This construction is supported by the intrinsic evidence. For example, at column 1, lines 27 through 29, it states that current time is "in effect, a current 'position' in the media content that is being displayed and rendered." Further down that column into the next it notes that current time may be represented by either "presentation time" or "content time."[11]

The specification further defines presentation time as "time elapsed since the beginning of the media content presentation" and content time as "a location in the media content stream that is currently being played."[12]

I also note that Defendants' proposal is not helpful. The portions of the specification cited are referencing the prior art – not the invention of the patent.

The seventh term is "rendering system" found in the '903 patent family. Plaintiff proposes that no construction is necessary. Defendants propose a lengthy construction that incorporates a number of limitations [*i.e.*, "A client system having the following characteristics: (a) the Renderer processes Temporal Sequence

---

[11]   ('903 Patent at 1:50-2:8).

[12]   ('903 Patent at 1:52-55 & 1:64-66).

12

Presentation Data; (b) the Renderer processes data elements in an ordered sequence in which "earlier" elements are processed before "later" elements (the order may be determined by the order in which the elements are submitted to the Renderer, or by the Data Times of the elements, or by using other techniques); (c) processing a data element takes a finite amount of time (possibly but not typically zero) known as the Rendition Period of the data element; (d) processing a sequence of data elements takes a finite amount of time directly related to the sum of the Rendition Periods of the individual elements, and, potentially, some other factors (the amount of time required to process (render) a sequence of data elements is called a Cumulative Rendition Period for those elements); and (e) at least one instance of a Renderer (often associated with rendering of audio data) has a capability of reporting back to a module, for example, a Presentation System Control Module, upon request, a current value of the Cumulative Rendition Period (a Renderer that is consistently used by the Presentation System in this fashion is referred to as a Timing Renderer)."].

Here I will construe the term to mean "a system for rendering temporal sequence presentation data."

Defendants' proposal is based on the definition in the specification of a "Renderer." That is not a clear definition of "rendering system." Indeed, the specification uses the term "rendering system" repeatedly and uses the term "Renderer" with a capital R and it is not clear that the two are used interchangeably. And, in fact, it appears that the rendering systems in the specification have different characteristics than the characteristics as the Renderer as defined. . . . [I]t appears that a Renderer may be a component of the rendering system. But it is not itself a "rendering system."

The eighth term is "portion(s)" found in all of the patent families. Plaintiff proposes that it should have its plain and ordinary meaning, which they say is "a part of any whole, either separated from or integrated with it." Defendants propose that it should mean "less than a whole."

I will construe it to mean "a part of any whole, either separated from or integrated with it." This is consistent with the ordinary meaning as defined by the Random House Dictionary of the English Language (2nd Ed. 1987), which was cited by Defendants.

Defendants have asked me to define it as "less than a whole" – saying there is a further dispute and citing to Plaintiff's

13

infringement contentions. I do not view that dispute as an issue of claim construction but rather one of infringement – whether that particular thing asserted to be a portion is a "portion" as I have construed it.

The ninth term is "tangibly stored . . . in a computer readable medium"/"computer readable medium tangibly storing" found in the '903 patent family. Plaintiff proposes that no construction is needed. Defendants propose "stored in a non-volatile storage element /a non-volatile storage element storing."

I will give the term its plain and ordinary meaning. And to be clear, that includes storage in both volatile and non-volatile memory.

Although Defendants point to a passage that refers to storage devices suitable for tangibly embodying computer program instructions, that is an exemplary statement and not a clear disclaimer. Defendants' attempt to read in that limitation is also inconsistent with the claims and specification of the '903 patent, which refers to things such as "temporal sequence presentation data" as being stored in a buffer, which is a volatile storage medium.[13] In addition, it is inconsistent with the '903 patent, which, at column 22, lines 41 through 43, states that "a storage medium readable by the processor (include[s], for example, volatile and non-volatile memory and/or storage elements)."

The tenth term is "rate which causes a portion to be skipped" found in the '433 patent. Plaintiff proposes "a rate of infinity of other indicium which directs the presentation system to skip a portion." Defendants propose "a rate of infinity which directs the presentation system to skip a portion."

The dispute here is over Plaintiff's inclusion of the words "other indicium" in its construction. Those words come directly from the '433 patent. In column 33, lines 30 to 35, the '433 patent refers to an embodiment, stating "[i]n this embodiment of the present invention, a PR (TSM rate) of 'infinity' (or some other indicium that will be similarly translated) directs the presentation (playback) system to skip sections of an MW (an audio or audio-visual work) whose concept has a corresponding PR (TSM rate) of infinity."

---

13     (*See, e.g.*, '903 Patent at 11:39-45).

That the patent contemplates an indicium other than a rate of infinity to direct the presentation to skip sections is inconsistent with Defendants' proposal to limit the definition to a rate of infinity.

I will thus construe the term as Plaintiff proposes – that is "a rate of infinity or other indicium that will be similarly translated which directs the presentation system to skip a portion."

The eleventh term is "insistence information that specifies a measure of importance of utilizing presentation rate information" found in the '228 patent family. Plaintiff proposes that no construction is needed. Defendants propose "a code (such as 'mandatory,' 'strongly encouraged,' 'suggested,' and 'optional'), number on a standard scale, or value representing an increment, decrement or scale factor, that is interpreted in order to derive playback rates."

I will construe the term to mean "information that specifies the measure of importance of utilizing presentation rate information." I think that the term is used consistent with its ordinary meaning and as it is used in the claims.

I am rejecting Defendants' proposed construction because it is based on reading in limitations from embodiments. Those are embodiments and do not exclude other embodiments for "insistence information."

The twelfth term is "speed contour" found in the '184 patent. Plaintiff proposes "information representing a desired TSM rate for some or all portions of the audio-visual work." Defendants propose "information representing a desired playback rate for an audio or audio-visual work for some or all points of the work."

I think the main dispute here is between the use of TSM rate and playback rate and the parties agree that the construction of this term is resolved with my construction of TSM rate. I will thus construe this term to mean "information representing a desired playback rate for an audio or audio-visual work for some or all portions of the work."

This construction is consistent with the language of the claims of the '184 patent. For example, claim 1 refers to two different "playback rates" used to present one or more portions of media work.

There is no reason to change the word "portions" in the claims to all "points" as Defendants suggest. Nor is there a reason

to change the "playback rate" claimed to a "TSM rate." That being said, I note that the parties agree that these two terms, "playback rate" and "TSM rate," are synonymous so this does not seem to be a real dispute.

The thirteenth term is "temporal sequence presentation data" found in the '903 patent family. Plaintiff proposes "plain and ordinary meaning (i.e., digital data representative of media content to be played in a predetermined order)." Defendants again propose a lengthy definition having multiple parts.

Here, I agree with Defendants and will construe the term as they propose. The construction is lengthy and I am not going to read it into the record, but I will set it out in the order I issue.[14]

This is a coined term by the Plaintiff and the construction is the definition given to the term by the Plaintiff acting as its own lexicographer. At lines 14 through 15 of column 8 of the '903 patent, the patent refers to "temporal sequence presentation data" and says "defined below." Then "below" in that column, starting at line 65 and carrying over to column 9, line 45, it states "[a]s defined herein, Temporal Sequence Presentation Data, also referred to as Presentation Data, means data having the following characteristics." And then they are listed.

The fourteenth term is "media work content properties" found in the '888 patent family. Plaintiff proposes "properties of a media work obtained by identifying objects, people, sounds and words." Defendants propose "information, an algorithm, or codes used to control presentation rates."

I will construe this term to have its plain and ordinary meaning, which does not require "identifying objects, people, sounds and words" as proposed by Plaintiff or "information, an algorithm, or codes used to control presentation rates" as proposed by Defendants.

The specification provides examples of "media work content properties," but does not limit those properties in either the way Plaintiff proposed or the way that Defendants proposed.

I will also refrain from reading in Defendants' proposal that it "control presentation rates." That appears in an embodiment.

---

14     (*See supra* pgs. 3-4).

The fifteenth and final term is "component" found in the '903 patent family. Plaintiff proposes that no construction is needed. Defendants propose that it means "discrete part." I will construe the term to mean "a part of the rendering system as a whole."

This construction is consistent with the ordinary meaning of the term. It is also consistent with the intrinsic evidence. For example, the claims of the '903 patent family refer to actions that can be taken by a "component" of the claimed rendering system. Similarly, in the specification, the '903 patent uses the word "component" repeatedly consistent with its ordinary meaning.

I will not read into the term the word "discrete." That word does not appear in the claims or the specification and it is unclear what it actually means. Defendants' support for inclusion of the word "discrete" comes from an embodiment. I will refrain from reading in an embodiment.

To the extent that there is an issue as to whether whatever Plaintiff is asserting infringes the claims is actually a "component," that seems to be an infringement issue that can be raised later.

_____
The Honorable Maryellen Noreika
United States District Judge